## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | |
|---|---|
| BRODTI INC., | |
| Plaintiff, | |
| v. | Civil Action No. 6:24-cv-58 |
| GOOGLE LLC, | JURY TRIAL DEMANDED |
| Defendant. | |

## COMPLAINT

Plaintiff BrodTi Inc. ("BrodTi" or "Plaintiff") files this Complaint against Defendant Google LLC ("Google" or "Defendant") and as claim for relief states as follows:

## NATURE OF THE ACTION

1.      This is an action brought under the Patent Laws of the United States, Title 35, United States Code, including 35 U.S.C. § 271, for infringement of United States Patent No. 11,416,898 ("the'898 Patent").

## PARTIES

2.      Plaintiff is a Delaware corporation with an address of 99 Wall Street, Suite 4042, New York, New York 10001.

3.      Defendant is a Delaware limited liability company with a principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043.

4.      Defendant has regular and established places of business throughout the State of Texas and within this District, including at least at 500 West 2nd Street, Suite 2900, Austin, Texas 78701 and 110 East Houston Street, Suite 400, San Antonio, Texas 78205.  Defendant is registered to do business in Texas and may be served via its registered agent at Corporation Service Company

1

d/b/a CSC-Lawyers Incorporating Service Company, 211 East 7th Street, Suite 620, Austin, Texas 78701.

5.     Defendant does business in Texas, directly and/or through intermediaries, and offers its products and services, including those accused herein of infringement, to customers and potential customers located in Texas and within this District.

## JURISDICTION

6.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.*

7.     This Court has personal jurisdiction over Defendant because Defendant regularly conducts business and has committed acts of patent infringement within this District, giving rise to this action.  Defendant has established minimum contacts with this forum such that the exercise of jurisdiction over Defendant would not offend traditional notions of fair play and substantial justice.  Defendant has committed and continues to commit acts of infringement in this District, the State of Texas, and elsewhere in the United States by making, using, offering to sell, and selling its infringing products and services and inducing, causing, urging, encouraging, aiding, and abetting the infringement of the '898 Patent by third-party users of its products and services, including residents of this District.

8.     Venue in this judicial district is proper under 28 U.S.C. §§ 1391 and 1400 because Defendant is registered to do business in the State of Texas and because Defendant maintains regular and established places of business in this District, conducts business within this District, advertises within this District, and makes, uses, offers to sell, and sells in this District, including to residents of this District, its infringing products and services.

**FACTUAL BACKGROUND**

9.     Plaintiff is the owner of all rights, title, and interest in and to the '898 Patent.  A true and correct copy of the '898 Patent is attached as Exhibit A.

10.     The '898 Patent, titled: "Method, Systems, and Apparatus for Financing Projects," issued on August 16, 2022.  Plaintiff's invention relates to a method, systems, and apparatus for project funding that utilizes an advertiser funding model to eliminate reliance on traditional fundraising systems.

11.     Google is a technology company and a provider of advertising services on the internet.  Its portfolio of products and services includes Google Ads, Google AdSense, Google Maps, Google Pixel, Google Play Store, Google Search, and YouTube, among many others.  Google provides its products and services both directly and through subsidiaries and business units it owns and controls.

12.     Defendant owns, operates, manages, and provides content for its websites, including but not limited to google.com (Google Search), ads.google.com (Google Ads), adsense.google.com (Google AdSense), and youtube.com (YouTube) (collectively, the "Google Websites").  Through its Google Websites, Defendant makes, uses, offers to sell, and sells its products and services and directs and encourages its users to use and purchase its products and services.

13.     Defendant's about.google website states the following: "Advertising is what makes it possible to offer our products to everyone.  While we sell things like Pixel phones, apps on the Play Store, YouTube subscriptions, and tools for businesses, we make the vast majority of our money from advertising. . . . We make money selling ad space to businesses—big and small, global and local—in two key ways.  First, businesses can reach potential customers by showing ads on a

range of Google products such as Search, Maps, and YouTube.  Second, businesses can buy ad space that we show on sites and apps that partner with us, like news publications and blogs.  In this case, most of the money goes to the partner and helps fund their content.  So ads not only help support Google but also many other websites and creators."

14.     Google Ads is an online advertising platform that allows its users ("Client(s)") to create a variety of online advertisements, including "Search Ads," "Display Ads," "Shopping Ads," "Video Ads," and "App Ads."

15.     Google AdSense is an online advertising system that allows publishers of internet-based content ("Web Property Content Owner(s)") to monetize their content by displaying targeted Google ads within their content.

16.     Defendant conducts business and advertises, operates, offers to sell, and sells through its Google Websites its products and services, including but not limited to Google Ads and Google AdSense (collectively, the "Accused Systems"), throughout the United States and within this District.

17.     On information and belief, at all relevant times, Defendant was in the business of making, using, offering to sell, and selling through its Google Websites its products and services, including but not limited to the Accused Systems, in the United States and within this District.

18.     Defendant has and continues to infringe, induce others to infringe, and/or contributorily infringe at least claim 19 of the '898 Patent by making, using, offering to sell, and selling its products and services, including but not limited to the Accused Systems, throughout the United States and within this District.

19.     The Accused Systems operate together as a system to perform an advertiser funding method by which: (1) Clients upload advertising material and select from a plurality of advertising

buy options; (2) Google accepts advertising revenue and populates web property content (e.g., YouTube videos) with the Client's advertisement in accordance with the selected buy option; (3) upon meeting a predetermined number of valid impression, Google ceases to populate web property content with the Client's advertisement; and (4) Google transmits a share of the advertising revenue to the Web Property Content Owner.  For example, a Client can "create your video ads with Google Ads," select "who should see your ad" and "how much you want to spend," and have the ads "appear on YouTube":



20.     Defendant's Google Ads website states the following: "Through Google Ads, you can create online ads to reach people exactly when they're interested in the products and services that you offer.  You choose where your ad appears, set a budget that's comfortable for you, and easily measure the impact of your ad."

21.     Google Ads provides a Client with a plurality of buy options for advertising, including the currency used for purchase, the daily budget, the monthly maximum, and the range of estimated impressions.  The range of estimated impressions offered by Google Ads corresponds

with a Client's selected budget, for example, a "$15 daily average" and "$456 monthly max" allows a Client to "[g]et an estimated 500–850 ad clicks each month":



22.   Defendant's Google Ads website further states the following: "Your account will stop serving ads if your budget is spent or a specific end date is reached.  Check your account budgets regularly to make sure that your ads continue serving."

23.   Defendant's Google AdSense website states the following: "Google AdSense is for publishers.  If you own or manage websites, blogs, or forums, and want to monetize them, the Google AdSense program could be for you.  Ads appear on your digital property, and you can earn revenue based on the number of people who view or engage with these ads."

24.   Google directly infringes the '898 Patent by making, using, offering to sell, and selling in this District and throughout the United States its infringing products and services, including but not limited to the Accused Systems, through its Google Websites.

25.   Google indirectly infringes the '898 Patent by inducing, causing, urging, encouraging, aiding, and abetting the infringement of the '898 Patent by third-party users of the Accused Systems, including Clients and Web Property Content Owners.  Google knowingly and actively encourages Clients and Web Property Content Owners to use its Accused Systems to

infringe the '898 Patent by advertising the infringing method performed by the Accused Systems and instructing its third-party users to infringe.

26.     Google knowingly and actively encourages Clients to use its Accused Systems to infringe the '898 Patent by, for example, offering Clients an initial $500 credit "[t]o help you get started with Google Ads" as well as "free personalized support" with a "Google Ads Expert":



27.     Google knowingly and actively encourages Web Property Content Owners to use its Accused Systems to infringe the '898 Patent by, for example, providing Web Property Content

Owners with step-by-step instructions and "help that's specific to you" from an "AdSense expert" to monetize their web property content:



28.     Google contributorily infringes the '898 Patent by providing its products and services, including but not limited to the Accused Systems, to its U.S. users who, in turn, use the infringing products and services.

<u>**COUNT ONE**</u>
<u>**INFRINGEMENT OF U.S. PATENT NO. 11,416,898**</u>

29.     Plaintiff incorporates by reference the allegations set forth in paragraphs 1–31 herein.

30.     Pursuant to 35 U.S.C. § 271(a), Defendant has directly infringed (literally and/or under the doctrine of equivalents) at least claim 19 of the '898 Patent by making, using, offering to sell, and selling in this District and throughout the United States its infringing products and services, including but not limited to the Accused Systems, through its Google Websites.

31.     In violation of 35 U.S.C. § 271(b), Defendant has infringed (literally and/or under the doctrine of equivalents) at least claim 19 of the '898 Patent indirectly by inducing, causing,

urging, encouraging, aiding, and abetting the infringement of the '898 Patent claim by third-party users of the Accused Systems, including Clients and Web Property Content Owners.  Defendant knowingly and actively encourages Clients and Web Property Content Owners to use its Accused Systems to infringe the '898 Patent by advertising the infringing method performed by the Accused Systems and instructing its third-party users to infringe.

32.     In violation of 35 U.S.C. § 271(c), Defendant has infringed (literally and/or under the doctrine of equivalents) at least claim 19 of the '898 Patent indirectly by contributing to the infringement of at least claim 19 of the '898 Patent.  Defendant provides its products and services, including but not limited to the Accused Systems, to its U.S. users who, in turn, use the infringing products and services.

33.     On information and belief, Defendant had knowledge of the '898 Patent since at least as early as August 2022, when the '898 Patent issued.

34.     On information and belief, while fully aware that its products and services, including but not limited to the Accused Systems, infringed one or more of the claims of the '898 Patent, Defendant made, used, offered to sell, and sold its infringing products and services and induced others to use its infringing products and services.

35.     As a result of Defendant's infringement of the '898 Patent, Plaintiff has suffered monetary losses for which it is entitled to an award of damages that is adequate to compensate Plaintiff for the infringement under 35 U.S.C. § 284, in no event less than a reasonable royalty.

36.     On information and belief, Defendant's infringement of the '898 Patent has been deliberate, willful, and with full knowledge, or willful blindness to knowledge, of the '898 Patent.

37.     Plaintiff has suffered damages in an amount to be determined at trial by reason of Defendant's willful infringement of the '898 Patent.

38.     Defendant's Accused Systems meet each and every element of at least claim 19 of the '898 Patent.  The Accused Systems meet the preamble "[a] system comprising."  Google Ads and Google AdSense, together with the Google Websites, operate as a system.

39.     Defendant's Accused Systems meet the claim element "a memory."  The Accused Systems employ various types of memory, including the servers operated and maintained by Google, which store and maintain information provided by Clients and Web Property Content Owners.

40.     Defendant's Accused Systems meet the claim element "one or more processors in communication with the memory."  The Accused Systems consist of various processors in communication with the memory, including Google server processors, Client processors, and Web Property Content Owner processors.

41.     Defendant's Accused Systems meet the claim element "program instructions executable by the processor via the memory to perform a method, the method comprising."  The Accused Systems utilize source code, i.e., program instructions, executable by processors via the memory to perform a method described below.

42.     Defendant's Accused Systems meet the claim element "receiving, by the one or more processors, from a given client, over an Internet-based communication link from a browsing application executed on the given client processor to the one or more processors, a message comprising data, the data comprising advertising material to populate on one or more websites." The Accused Systems are configured to receive, by one or more processors, from a given Client, over an internet-based communication link from a browsing application executed on the given Client processor to one or more processors, a message comprising data, the data comprising advertising material to populate on one or more websites.  For example, the Google Ads website

10

allows a Client to upload advertising material that will populate on one or more websites, such as YouTube, Google Search, or various websites maintained by Google or affiliates.

43.     Defendant's Accused Systems meet the claim element "identifying, by the one or more processors, the given client, based on receiving the message, an identifier, wherein the message comprises the identifier."  The Accused Systems require that a Client have a Google account to sign in, and the Client's advertisement, i.e., the message, is identified with the Client's account.

44.     Defendant's Accused Systems meet the claim element "based on a message provided by a given client, generating, by the one or more processors, a webpage, wherein the generating comprises providing, via a graphical user interface of the webpage, a plurality of advertising buy options for selection by a given client accessing said webpage."  The Accused Systems generate, by one or more processors, a webpage that provides a Client with a plurality of buy options on the Client's graphical user interface for the Client's selection.  For example, Google Ads provides a Client with a plurality of buy options for advertising, including the currency used for purchase, the daily budget, the monthly maximum, and the range of estimated impressions.

45.     Defendant's Accused Systems meet the claim element "obtaining, by the one or more processors, via an input in the graphical user interface, a selection of one or more of the advertising buy options, wherein the selected one or more advertising buy options comprise at least one website of the respective websites and a predetermined number of impressions of the advertising material for users visiting the at least one website."  The Accused Systems obtain a Client's selection of one or more advertising buy options, which comprise the respective websites and a predetermined number of impressions.  For example, Google Ads obtains a Client's selection of buy options, which involve showing the Client's advertisement on one or more websites, such

11

as YouTube, Google Search, or various websites maintained by Google or affiliates, and a predetermined number of impressions.

46.     Defendant's Accused Systems meet the claim element "generating, by the one or more processors, on a database accessible to the one or more processors, a repository for advertising revenue based on the selection."  The Accused Systems generate a repository for advertising revenue and accept payment for an advertisement campaign based on a Client's selection of a buy option.

47.     Defendant's Accused Systems meet the claim element "based on obtaining the selection, populating, by the one or more processors, the advertising material on the at least one website, wherein the populating comprises placing the advertising material within web property content of the at least one website."  The Accused Systems populate, by one or more processors, a Client's advertising material within web property content of at least one website.

48.     Defendant's Accused Systems meet the claim element "monitoring, by the one or more processors, a number of impressions of the advertising material provided to users accessing the web property content displayed on the at least one website."  The Accused Systems monitor, by one or more processors, the number of impressions the displayed advertising material obtains, and Clients can view the number of impressions a specific advertisement obtains.

49.     Defendant's Accused Systems meet the claim element "determining, by the one or more processors, whether an impression of the advertising material is valid, wherein the impression is valid based on a predetermined impression tracking system."  The Accused Systems determine, by one or more processors, whether an impression is valid based on a predetermined impression tracking system by which invalid impressions are excluded.

50.     Defendant's Accused Systems meet the claim element "determining, by the one or

12

more processors, that the number of valid impressions is greater than or equal to the predetermined number of impressions." The Accused Systems determine, by one or more processors, that the number of valid impressions is greater than or equal to the predetermined number of impressions.

51.     Defendant's Accused Systems meet the claim element "upon determining a number of valid impressions are met, ceasing, by the one or more processors, the populating of the advertising material on the at least one website." The Accused Systems cease, by one or more processors, the populating of a Client's advertising material upon determining that the predetermined number of valid impressions is met.

52.     Defendant's Accused Systems meet the claim element "based on determining a number of valid impressions are met, electronically collecting, by the one or more processors, a share of the advertising revenue to be transmitted to the web property content owner." The Accused Systems electronically collect, by one or more processors, shares of the advertising revenue to be transmitted to Web Property Content Owners. For example, Web Property Content Owners can register with Google AdSense to monetize their content.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays for relief, as follows:

A.     Declaring that Plaintiff is the owner of all right, title, and interest in and to United States Patent No. 11,416,898, together with all rights of recovery under such patent for past infringement thereof;

B.     Declaring that United States Patent No. 11,416,898 is valid and enforceable in law and that Defendant has infringed said patent;

C.     Awarding to Plaintiff its damages caused by Defendant's infringement of United States Patent No. 11,416,898;

D.     Entering a preliminary and permanent injunction against Defendant, its officers,

employees, attorneys, all parent and subsidiary corporations and affiliates, their assigns and successors in interest, and those persons in active concert or participation with any of them who receive notice of the injunction, enjoining them from continuing acts of infringement of United States Patent No. 11,416,898;

E.      Declaring that Defendant's infringement has been willful and said damages be trebled pursuant to 35 U.S.C. § 284;

F.      Declaring that this is an exceptional case and awarding to Plaintiff its costs, expenses, and reasonable attorney fees pursuant to 35 U.S.C. § 285; and

G.      Awarding to Plaintiff such other and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

In accordance with Fed. R. Civ. P. 38(b), Plaintiff hereby demands a trial by jury for all issues triable by jury.

Dated:  January 29, 2024

Respectfully submitted,

By:   */s/ Lisa A. Paulson*
     Dariush Keyhani (*pro hac vice* to be filed)
     District of Columbia Bar No. 1031500
     dkeyhani@keyhanillc.com
     Frances H. Stephenson (*pro hac vice* to be filed)
     fstephenson@keyhanillc.com
     New York Registration No. 5206495
     KEYHANI LLC
     1050 30th Street NW
     Washington, DC 20007
     T. 202.748.8950
     F. 202.318.8958

     Lisa A. Paulson
     Texas Bar No. 00784732
     lapaulson@dgclaw.com
     DAVIS, GERALD & CREMER, P.C.
     515 Congress Avenue, Suite 1510
     Austin, Texas 78701-2984
     T: 512-493-9600
     F: 512-493-9625

     **ATTORNEYS FOR PLAINTIFF BRODTI INC.**

US011416898B2

(12) **United States Patent**
DeTitta

(10) Patent No.:     **US 11,416,898 B2**
(45) Date of Patent:     ***Aug. 16, 2022**

(54) **METHODS, SYSTEMS, AND APPARATUS FOR FINANCING PROJECTS**

(71) Applicant: **John E. DeTitta**, Fairport, NY (US)

(72) Inventor: **John E. DeTitta**, Fairport, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 676 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/422,106**

(22) Filed: **May 24, 2019**

(65) **Prior Publication Data**

US 2019/0279259 A1     Sep. 12, 2019

**Related U.S. Application Data**

(63) Continuation of application No. 14/015,604, filed on Aug. 30, 2013, now Pat. No. 10,325,290, which is a (Continued)

(51) **Int. Cl.**
*G06Q 30/00*          (2012.01)
*G06Q 30/02*          (2012.01)

(52) **U.S. Cl.**
CPC ......... *G06Q 30/0273* (2013.01); *G06Q 30/02* (2013.01)

(58) **Field of Classification Search**
CPC ................ G06Q 30/0273; G06Q 30/02–0277
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

2002/0049816 A1*   4/2002   Costin, IV ........... G06Q 30/0601
                                                     705/26.1

FOREIGN PATENT DOCUMENTS

WO      WO-2016118843 A1 *   7/2016   ......... G06Q 30/0201

OTHER PUBLICATIONS

Online fund-raising malls :fund raising goes high-tech; Raddatz, Dick; Fund Raising Management ;Jun. 2000; 31, 4;p. 12Jun. 2000. (Year: 2000).*

(Continued)

*Primary Examiner* — Raquel Alvarez

(57)     **ABSTRACT**

A method of producing and financing a predetermined project is disclosed. In an embodiment, the method comprises the steps of selecting a project and developing a budget for the project, and developing a marketing plan which is comprised of a plurality of advertising buys, each of the plurality of advertising buys being targeted toward a corresponding one of a plurality of advertisers. Further, there is a set of advertising materials that are targeted toward a corresponding one of the plurality of advertisers. The subject matter of the selected project relates to the interests of at least one of the plurality of advertisers, the cost of developing the marketing plan and the set of advertising materials not exceeding the developed budget. The next step presents to at least one of the plurality of advertisers the cost of the budget and the advertising material of at least one of the plurality of advertising buys, each of the plurality of advertising buys may require a predetermined number of impressions to be completed. Further, if the at least one advertising buyer purchases the at least one advertising buy, the advertising materials are produced and placed on a media property. For at least one of the plurality of advertising buys, the number of impressions to which at least one user is exposed on the on media property are counted, thereby completing the one advertising buy when the counted number of impressions equals its buy's predetermined number of impressions. Finally, the revenue from the completed advertising buy is collected and the selected revenue produced by the completed advertising buy is placed into a media production fund.

**20 Claims, 2 Drawing Sheets**



**US 11,416,898 B2**

Page 2

### Related U.S. Application Data

continuation-in-part of application No. 11/274,706, filed on Nov. 14, 2005, now abandoned.

(60)  Provisional application No. 60/626,933, filed on Nov. 12, 2004.

(56)  **References Cited**

OTHER PUBLICATIONS

Kaplan, K. (Aug. 28, 2000) Monday Business; republicans work for change with E-commerce site; web: RepublicanShopping.com takes political fund-raising into new territory by offering goods online and getting a cut of profit. : Home edition. Los Angels Times. (Year: 2000).*

ZDNet donates $1 million dollars in advertising availabilities to benefit tomorrows children fund. (Dec. 22, 1999) PR Newswire.*

* cited by examiner



FIG. 1



FIG. 2

US 11,416,898 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# METHODS, SYSTEMS, AND APPARATUS FOR FINANCING PROJECTS

## CROSS-REFERENCE TO RELATED APPLICATION

This application is a continuation of U.S. application Ser. No. 14/015,604, filed Aug. 30, 2013, titled "Methods, Systems, and Apparatus for Financing Projects", which is incorporated by referenced herein in its entirety, which is a continuation in part of U.S. application Ser. No. 11/274,706, filed Nov. 14, 2005, titled "Method and Apparatus for Producing and Financing Media Productions", which is incorporated by reference herein in its entirety, and which claims the benefit of priority of U.S. Provisional Application No. 60/626,933, filed Nov. 12, 2004, titled "AdFilmTies Film Financing Process", which is incorporated by reference herein in its entirety.

## FIELD OF THE INVENTION

The present invention relates generally to media financing and more specifically it relates to such a process that allows advertisers to finance media productions through advertising media buys while eliminating the risk of normal event financing speculative investment. Besides media productions, other projects that may be financed using the present invention include non-profit related project, a business related project, a cause-related project, a real-estate related project and an art related project.

## BACKGROUND OF THE INVENTION

There are many instances in today's marketplace of having to raise money to fund a desired project. Such projects may be in the form of various new business projects and ventures including, but not limited to, non-profit projects, cause-related projects, real-estate projects and projects related to the arts. Historically people needing to raise money for such projects have had to turn to using personal funds, charitable contributions of others, government grants, bank and other third party loans and investors which expect a return on their investment. Due to the limited pool of grant money, the number of prospective donors having cash available and the uncertainty of the ultimate success of many of these projects which may deter the banks and investors, fund raising is notoriously difficult.

With the continuing popularity and use of social media for business purposes, there has developed new types of fund raising mediums such as "crowd funding", for example, which allows projects to be listed on a crowd funding internet site such as "Kickstarter.com". In this methodology, anyone with an internet connection can donate their money to the project of their choice. As stated m Wikipedia (http://en.wikipedia.org/wiki/Crowd_funding#Pros_and_cons):

"Crowdfunding (alternately crowd financing, equity crowdfunding, crowd-sourced fundraising) is the collective effort of individuals who network and pool their money, usually via the Internet, to support efforts initiated by other people or organizations.[1][2] Crowdfunding is used in support of a wide variety of activities, including disaster relief, citizen journalism, support of artists by fans, political campaigns, startup company funding,[3] motion picture promotion,[4] free software development, inventions development, scientific research,[5] and civic projects.", and

"Crowdfunding can also refer to the funding of a company by selling small amounts of equity to many investors.

This form of crowdfunding has recently received attention from policymakers in the United States with direct mention in the JOBS Act; legislation that allows for a wider pool of small investors with fewer restrictions.[2] While the JOBS Act awaits implementation, hybrid models, such as Mosaic Inc., are using existing securities laws to enable the public in approved states to invest directly in clean energy projects as part of a crowd.", and

"Crowdfunding has its origins in the concept of crowdsourcing, which is the broader concept of an individual reaching a goal by receiving and leveraging small contributions from many parties. Crowdfunding is the application of this concept to the collection of funds through small contributions from many parties m order to finance a particular project or venture."

Since this is such a new area of internet commerce, as noted by Wikipedia, legislation is still developing in this area in an attempt to put some controls over the process which may limit the availability of this methodology as a potential funding source for many people.

Furthermore, this methodology relies on people willing to donate their own money to the project which makes it difficult to raise money especially if the project is not emotionally appealing to a large population of potential contributors.

Due to the above described limitations of existing fund raising methodologies, there remains a need for an improved method, system and apparatus for raising funds for projects.

## SUMMARY OF THE INVENTION

It is an object of the present invention to provide a project funding method, system and apparatus that will overcome the shortcomings of current methodologies, systems and systems.

It is a further object of the present invention to provide a process for raising funds for a predetermined project which utilizes an advertiser funding model which eliminates the requirement for traditional fund raising systems which rely on charitable contributions of the consumer, expect a return on investment, are limited in availability (e.g., grants), or otherwise have inherent risk associated with the success of the project.

It is yet a further object of the invention to provide a fund raising method, system and apparatus which does not rely on charitable contributions by third parties directly into the fund, yet allows the third party to participate in the building of the desired fund by accessing the media outlets and properties attributed to an advertiser's media buy which is linked to the selected project.

Other objects and advantages of the present invention will become obvious to the reader and it is intended that these objects and advantages are within the scope of the present invention.

The media outlet may be selected from a group comprising a website, newspaper, telephone directory, radio or television, for example.

The project may be selected from a group comprising a non-profit project, a business project, a cause-related project, a real-estate project and an art related project, for example.

In yet another aspect of this invention, the project may be presented to produce added value advertising selected from the group comprising product placement, public relations, branded entertainment or other merchandising and other project related associations all or some of which may be included in the standard media buy.

US 11,416,898 B2

3

In a still further aspect of this invention each of the media properties/advertising materials 1s selected from a group comprising an internet banner advertisement, print advertisement, radio advertisement or television advertisement.

DESCRIPTION OF THE DRAWING FIGURES

The foregoing objects and advantages of the present invention may be more readily understood by one skilled in the art with reference being had to the following detailed description of a preferred embodiment thereof, taken in conjunction with the accompanying drawings wherein like elements are designated by identical reference numerals throughout the several views, and in which:

FIG. **1** is a functional block diagram illustrating how a user's browser and a server of the website to be accessed by the user's browser are connected to and by a communication link to each other; and

FIG. **2** is a flow diagram of the process of financing a project in accordance with the teaching of the present invention.

DETAILED DESCRIPTION OF A PREFERRED EMBODIMENT

Referring now to the drawings and in particular to FIG. **1**, there is shown an embodiment of this invention which permits a browser or user, using his/her client system **10** to access a server system **18** by exchanging messages over a communication link **16**. In one illustrative embodiment of this invention, it may take the form of the Internet. The client system **10** comprises of a browser **12** and its assigned client identifier, which is known as a "cookie". The client identifier is stored in a file **14**. Though only a single client system **10** is illustrated in FIG. **1**, it will be appreciated that there would typically be a plurality of client systems **10**, which are connected by a communications link **16** to the server system **18**. In one illustrative embodiment of this invention, the user initiates on the browser **12** a communications session with the server system **18** by assigning and sending over the link **16** his/her client identifier to the client system **18**. From then on, the client system **10** includes its client identifier with all messages sent to the server system **18** so that the server system **18** can identify the particular client system **10** from which the message was sent.

The server system **18** comprises, as shown in FIG. **1**, a web server **18**a, a data base server **18**b and an advertising server **18**c. The server system **18** is front ended as described above, in that the user can access the system **18** by sending requests from the browser **12** via the communication link **16** to the web server **18**a. The advertising server **18** is programmed to regulate the advertisements to be seen by the users. This can be done by storing the advertisement materials in the form of acceptable internet standards, i.e. banner ads, pop-ups, text ads and rich media, in corresponding databases **38**, **40** and **42**. The advertising server **18**c is programmed to run the ads based on predetermined impressions, length of contract with the advertiser. This data is back ended, i.e. this data is input to the server system **18** via a media buy block **32**.

The internet comprises a vast number of computers and computer networks that are interconnected through communication links such as the link **16** as shown in FIG. **1**. The interconnected computers exchange information using various services, such as electronic mail, Gopher, and the World Wide Web ("WWW"). The WWW service allows a server computer system (i.e., Web server or Web site) to send

4

graphical Web pages or screens of information such as the advertising materials to a remote client computer system **10**. The remote client computer system **10** can then display the Web pages. Each resource (e.g., computer or Web page) of the WWW is uniquely identifiable by a Uniform Resource Locator ("URL"). To view a specific Web page in a request (e.g. a HyperText Transfer Protocol ("HTTP") request), the request is forwarded to the Web server **18**a that supports that Web page **18**a; when the Web server **18**a receives the request, it sends that Web page to the client computer system **10**. When the client computer system **10** receives that Web page, it typically displays the Web page using the browser **12**. The browser **12** is a special-purpose application program that effects the requesting of Web pages and the displaying of Web pages.

Currently, Web pages are typically defined using Hyper-Text Markup Language ("HTML"). HTML provides a standard set of tags that define how a Web page is to be displayed. When a user indicates to the browser **12** to display a Web page, the browser sends a request to the server computer system an HTML document that defines the Web page. When the requested HTML Document is received by the client computer system, the browser **12** displays the Web page or screen.

The World Wide Web is especially adapted to conducting electronic commerce and advertising. In an illustrated embodiment of this invention, the primary focus is on the advertising of the internet, which is a 5 billion dollar per quarter industry.

Advertising on the internet is created by and through the media property and content on the web property. The web property is marketed to a target audience who visits the web property to view the content provided. Every time an individual visits the web property, he/she creates an impression.

Referring now to FIG. **2**, there is shown a preferred embodiment of the media production financing system **50** in accordance with the teachings of this invention. FIG. **2** shows the invention flow from a creative process **51** to the finished financed production media. The financing process **50** begins with the creative process **51**, wherein the producer, who is defined as the manager of the development of the media production, seeks in step **52** to identify a screenplay to produce. Upon selecting of a screenplay that the producer feels would be well received in the marketplace, the producer constructs in step **54** a screenplay development budget for producing the screenplay into a media production, which may illustratively take the form of a film. The screenplay production budget defines the costs to take the screenplay and make it into the media production.

Once a budget is completed, the producer presents the finished creative process **51** to the company. The company is the owner or a licensee of the creative process. In an illustrative embodiment of this invention, the company has internal divisions to administer the creative process. A marketing department for example evaluates in step **58** the screenplay and determines in step **60** a target audience of potential viewers. The target audience includes a demographic, which comprises the age, sex and interests of that audience that would view the finished media production. For example as set forth in our current usage, we have included a site **130**, which creates a demographic of individuals who would be interested in the movie industry and, therefore, a target audience for the advertisers within a community of targeted users. It also attracts a demographic of individuals in the 16-35 year range. Upon determining a target audience, the marketing team creates in step **62** a media property and then promotes it to attract potential targeted audience to

US 11,416,898 B2

5                                                                    6

access and view the media property. The media property comprises a description of the relevant target audience and the content carried by the media that could illustratively take the form of print, radio, television or as defined above in this financial media production process 50. When the media property is created in step 62, the marketing team begins to attract visitors to the media property creating impressions in step 64.

Ad Impression is defined by the Internet advertising bureau as the standard in internet advertising as a measurement of responses from an ad delivery system to an ad request from the user's browser 14, which is filtered from robotic activity and is recorded at a point as late as possible in the process of delivery of the advertising materials to the user's browser-therefore the closest to actual opportunity to see by the user.

In particular, an impression is a visitor to the website through access to the World Wide Web that visits a screen of the media property. These impressions create a commodity in the advertising community and are packaged by the sales team to be sold in step 66 to an advertiser.

The advertiser is an individual or company, which generally sells in step 68 a product or service, desires to market itself to the targeted audience and purchases the targeted impressions from the sales team at a predetermined media buy. A media buy defines a predetermined cost per impression, and the length of the contracts and ads to be displayed on the media property. The advertiser determines in step 72 the cost of the impressions and in step 78 creates and places the advertising materials on a screen of the media project. In the course of the financial process 50, the advertiser receives in step 71 additional added value benefits pre-determined in the media buy. These benefits result from the distribution in step 74 of the film and include movie association resulting from product placement, film interaction, branded entertainment, public relations value or other additional benefits to advertiser.

The media buy is then fulfilled by the company, as the terms of the media buy are completed. Once the media buy has been completed, the company will invoice in step 80 the advertiser for the cost of the media buy. The advertiser in step 82 now pays the invoice and the company takes the revenue generated and places it into the media production fund. The production fund in one illustrative embodiment is a bank account managed by the company. The fund then provides in step 84 the necessary funding to the producer as specified in his/her production development budget. The producer then uses these funds to finance the development of the screenplay into a finished production media.

Two methods are used to deliver ad content to the user-server-initiated and client-initiated. Server initiated ad counting uses the site's web content server 18a for making requests, formatting and re-directing content. Client-initiated ad counting relies on the user's browser 12 to perform these activities (in this case the term "client" refers to an internet user's browser 12). The standard method is a client-initiated approach of which the reference process 50 and for the sake of this description relies upon.

A valid impression may only be counted when an ad counter receives and responds to an HTTP request for a tracking asset from a client. The count must happen after the initiation of retrieval of underlying page content. Permissible implementation techniques include (but are not limited to) HTTP request generated by <IMG>, <FRAME>, or <SCRIPT SRC>. For client-side ad serving, the ad content itself could be treated as the tracking asset and the ad server itself could do the ad counting.

The response by the ad counter includes but is not limited to: Delivery of a "beacon", which may be defined as any piece of content designation as a tracking asset. Beacons commonly are in the form of 1×1 pixel image. Delivery of a "302" redirector or html/JavaScript (which doubles as a tracking asset) to any location, and delivery of ad content.

Measurement of any ad delivery may be accomplished by measuring the delivery of a tracking asset associated with the ad. The ad counter must employ standard header on the response, in order to minimize the potential of caching.

Each of these impressions has a value to them based on the audience and the value to the advertiser. Once a media property is created and visitors come to the media property site and there is a sufficient number of impressions to market the users to advertisers.

On the internet, the impression cost is based on guaranteeing/providing to the user on per thousand impressions or CPM. The average cost to the advertiser is 15$ per thousand impressions. A sales team of the company then markets the impressions on the website to the advertiser for a set number of impressions and cost in a media buy. A media buy sets the terms and cost of the advertising provided by the media property to the advertiser.

The media production finance process 50 then sells sufficient advertising to advertisers on the media property to obtain enough revenue for the cost of the budget provided by the producer. If the advertiser receives a standard media buy however, the funds generated from the media buy is placed into the media production fund that subsequently financed the media production.

It will thus be appreciated that the funding process of this invention is programmed to receive guaranteed impressions for selected media buys while having the advertiser's advertising dollars continue on to the project (e.g., media event) fund that is used to finance the desired project. A media outlet is identified that provides educational, entertaining and/or other informational content channels dealing with relevant subject matter. The media outlet is designed to generate impressions and/or consumers who are seeking information, help, education and/or entertainment with specific content. The consumers who access the media outlet produce an advertising commodity by creating impressions that may be sold to advertisers. A media outlet may include but is not limited to film, Television, Print, Internet (and a corresponding web site), Yellow Pages and other media outlets where the impressions are the circulation numbers as would be well known to those skilled in the art. The user is playing a part in the financing of what they consider a worthwhile project (e.g., the media event or other project that represents a social cause they consider important) by simply accessing (e.g., visiting and/or viewing the media outlet) and thereby getting content information. As will be explained in detail below, an impression is counted each time a user is exposed to the media content which may be (in the case of internet media outlet) a screen carrying certain advertising material. The potential impressions created by the consumer are sold as a commodity to the advertiser who is seeking targeted advertising to these consumers.

The net revenue paid by the advertiser is placed in a fund which is used to finance the selected project which may have subject matter of preference to the advertiser. Since the advertiser has received dollar for dollar advertising, there has been adequate consideration given for the money that funds the project and hence the funding model requires no dependence on the success of the project itself. As such, the risk associated with traditional investment models is eliminated. Furthermore, the pool of prospective fund contribu-

US 11,416,898 B2

7

tors is greatly increased since there is no money out of pocket for the people visiting the media outlets who are incentivized to visit the media outlet simply due to their interest in the subject matter of the project.

Once the threshold number of people accessing the media outlets for a particular project has been reached, the media buy is considered complete and the money the advertiser paid for the media buy is transferred to the project fund with the advertiser having received the advertising value of their media buy purchase. For print, television and radio outlets, the media buy revenue may be collected up front, if desired, since there is guaranteed circulation associated with the media buy.

The media outlet provides content of interest to the audience (the people accessing the media outlets) which may be tied to the subject matter of the project. The media outlet is designed to attract consumers who are seeking help, education, entertainment or other information with specific content or interest to the consumer and thus also the advertisers. For example, the media outlet can be internet based, radio, television or print that has informational, educational and/or entertaining content dealing with the specific subject matter.

The user (i.e., the individual who will access the media outlet to view the content provided therein) is someone who has an interest in the subject matter of the project and hence also the media outlet which has been designed to tie-in with the subject matter of the project. The user can access the media outlet which provides an advertising commodity by creating impressions (or other quantifiable evidence of the consumer accessing the advertiser's media outlet regardless of medium) that are sold to advertisers. Thus, without spending any of their own money, the user is playing a major role in the funding of projects of interest to them by simply accessing the media outlet.

The net revenue paid by the advertiser for the media buys is placed in a fund and this fund is used to finance the project which has subject matter of preference to the advertiser. More specifically, the subject matter of the project may attract a demographic of viewers that is a target demographic of the advertiser's products and/or services. Since the advertiser has received benefit from the advertising that is equal to the value of the fees input into the fund, there is no risk involved in the financing of the project.

The creation and financing of projects in accordance with this invention may further allow the target media outlet viewers to be educated on personal and social issues. For example, the financing process of this invention may begin with a media outlet that provides the advertising materials that generates impressions from the user who is seeking information on a specific content channel within the media outlet. The impressions created by the consumer are then sold to the advertiser who is interested in targeting a particular user with products or services and the revenue that is created by the advertiser is placed into the fund that finances projects dealing with the content subject matter of interest.

A person, group or company that wants to finance a project dealing with a specific subject matter can advertise on the media outlet to the consumers who view the content and subject matter. The advertiser has purchased advertising at cost and therefore has received a value equal to the advertiser's investment. The advertiser's media buy money is then placed into the fund that finances the project and at no financial risk to the advertiser.

The method of financing a project in accordance with this invention allows an entity to finance these projects through

8

advertising revenue. The process may begin with identifying a project in need of funding. The project administration verifies the budget required to finance the project, and provides the approved project fund amount to a marketing team. The marketing team reviews the project fund amount, the defined target audience and demographics of the defined audience.

The project may be any desired project, for example the media production financing system **50** described above with reference to FIG. **2**, or other projects including, but not limited to, a non-profit related project, a business related project, a cause-related project, a real-estate related project and an art related project. Thus, the financing process **50** begins with the identification of the project **52** and the amount required to fund the project **54**.

FIG. **2** shows the invention flow from a creative process **51** which identifies the project to be funded, to the finished financed production media. The financing process **50** begins with the creative process **51**, wherein the project fund champion, who may be defined as the manager of the project, seeks in step **52** to identify a project to fund. Upon identification of a project that the project manager feels would be well received in the marketplace, the project manager constructs in step **54** a project development budget for producing the project. The project budget defines the costs to make the project fully funded and viable such that it may exist for its stated purpose beyond the time the fund target has been reached.

Once a budget is completed, the manager presents the finished creative process **51** to the company. The company is the owner or a licensee of the funding process. In the illustrative embodiment of this invention shown in FIG. **2**, the Company evaluates in step **58** the project and determines in step **60** a target audience of potential viewers. The target audience may include a demographic, which comprises the age, sex and interests of that audience that would have an interest in the project. For example as set forth in our current usage, we have included a site **130**, which creates a demographic of individuals who would be interested in the project and, therefore, a target audience for the advertisers within a community of targeted users. It may also attract a demographic of individuals in a specific age range. Upon determining a target audience, the marketing team creates in step **62** a media property and then promotes it to attract potential targeted audience to access and view the media property. The media property comprises a description of the relevant target audience and the content carried by the media that could illustratively take the form of print, radio, television or as defined above in this financial process **50**. When the media property is created in step **62**, the marketing team begins to attract visitors to the media property creating impressions in step **64**.

In an internet media buy, the internet advertising media may be any internet advertising type (e.g., email marketing, search engine marketing, social media marketing, display advertising, and mobile advertising) using any desired internet advertising compensation model (e.g., CPM (Cost Per Mille), CPC (Cost per Click), CPA (Cost Per Action) and Fixed Cost).

For example, in display advertising, ad displays are usually called "impressions". An impression is defined by the Internet advertising bureau as the standard in internet advertising as a measurement of responses from an ad delivery system to an ad request from the user's browser **14**, which is filtered from robotic activity and is recorded at a point as late as possible in the process of delivery of the advertising materials to the user's browser-therefore the

9

closest to actual opportunity to see by the user. In the other types of media buys (print, radio, television, for example), impressions may be considered as the circulation numbers of the particular media buy outlet property type.

As an example, an impression may be a visitor to the website through access to the World Wide Web that visits a screen of the media property. These impressions create a commodity in the advertising community and are packaged by the sales team to be sold in step 66 to an advertiser. Again, in the other types of media properties (e.g., print, radio and television), circulation numbers are used to quantify and value the media buy associated with the chosen media property.

The advertiser is an individual, group or company which generally sells in step 68 a product or service, desires to market itself to the targeted audience and purchases the targeted impressions from the sales team at a predetermined media buy. In the above example, a media buy defines a predetermined cost per impression, and the length of the contracts and ads to be displayed on the media property. The advertiser determines in step 72 the cost of the impressions and in step 78 creates and places the advertising materials on a screen of the media project.

The media buy is then fulfilled by the Company, as the terms of the media buy are completed. Once the media buy has been completed (whether at the time of media buy purchase or at some later date), the advertiser may pay immediately or the Company may invoice in step 80 the advertiser for the cost of the media buy. In the invoices scenario, the advertiser in step 82 now pays the invoice and the company takes the revenue generated and places it into the project fund. The project fund in one illustrative embodiment is a bank account managed by the Company. The fund then provides in step 84 the necessary funding to the project owner as specified in his/her project development budget. The project owner then uses these funds to finance the development/production of the project.

As a further example, in the internet-based media buy, two methods may be used to deliver ad content to the user-server-initiated and client-initiated. Server initiated ad counting uses the site's web content server 18a for making requests, formatting and re-directing content. Client-initiated ad counting relies on the user's browser 12 to perform these activities (in this case the term "client" refers to an internet user's browser 12). The standard method is a client-initiated approach of which the reference process 50 and for the sake of this description relies upon.

In the above example, a valid impression may only be counted when an ad counter receives and responds to an HTTP request for a tracking asset from a client. The count must happen after the initiation of retrieval of underlying page content. Permissible implementation techniques include (but are not limited to) HTTP request generated by <IMG>, <FRAME>, or <SCRIPT SRC>. For client-side ad serving, the ad content itself could be treated as the tracking asset and the ad server itself could do the ad counting.

The response by the ad counter includes but is not limited to: Delivery of a "beacon", which may be defined as any piece of content designation as a tracking asset. Beacons commonly are in the form of 1×1 pixel image. Delivery of a "302" redirector or html/JavaScript (which doubles as a tracking asset) to any location, and delivery of ad content.

Measurement of any ad delivery may be accomplished by measuring the delivery of a tracking asset associated with the ad. The ad counter must employ standard header on the response, in order to minimize the potential of caching.

10

Each of these impressions has a value to them based on the audience and the value to the advertiser. Once a media property is created and visitors come to the media property site and there is a sufficient number of impressions to market the users to advertisers.

Continuing with the CPM example, the impression cost is based on guaranteeing/providing to the user on per thousand impressions or CPM. The average cost to the advertiser is 15$ per thousand impressions. A sales team of the company then markets the impressions on the website to the advertiser for a set number of impressions and cost in a media buy. A media buy sets the terms and cost of the advertising provided by the media property to the advertiser.

The media production finance process 50 then sells sufficient advertising to advertisers on the media property to obtain enough revenue for the cost of the project budget provided by the project owner. If the advertiser receives a standard media buy however, the funds generated from the media buy is placed into the project fund that subsequently financed the project.

Although the present invention has been described in terms of various embodiments, it is not intended that the invention be limited to these embodiments. Modification within the spirit of the invention will be apparent to those skilled in the art. The scope of the present invention is defined by the claims that follow.

What is claimed is:

1. A computer-implemented method comprising:

receiving, by one or more processors, from a given client, over an Internet-based communication link from a browsing application executed on the given client processor to the one or more processors, a message comprising data, the data comprising advertising material to populate on one or more websites;

identifying, by the one or more processors, the given client, based on receiving the message, an identifier, wherein the message comprises the identifier;

based on a message provided by a given client, generating, by the one or more processors, a webpage, wherein the generating comprises providing, via a graphical user interface of the webpage, a plurality of advertising buy options for selection by a given client accessing said webpage;

obtaining, by the one or more processors, via an input in the graphical user interface, a selection of one or more of the advertising buy options, wherein the selected one or more advertising buy options comprise at least one website of the respective websites and a predetermined number of impressions of the advertising material for users visiting the at least one website;

generating, by the one or more processors, on a database accessible to the one or more processors, a repository for advertising revenue based on the selection;

based on obtaining the selection, populating, by the one or more processors, the advertising material on the at least one website, wherein the populating comprises placing the advertising material within web property content of the at least one website;

monitoring, by the one or more processors, a number of impressions of the advertising material provided to users accessing the web property content displayed on the at least one website;

determining, by the one or more processors, whether an impression of the advertising material is valid, wherein the impression is valid based on a predetermined impression tracking system;

determining, by the one or more processors, that the number of valid impressions is greater than or equal to the predetermined number of impressions;

upon determining a number of valid impressions are met, ceasing, by the one or more processors, the populating of the advertising material on the at least one website; and

based on determining a number of valid impressions are met, electronically collecting, by the one or more processors, a share of the advertising revenue to be transmitted to the web property content owner.

**2**. The computer-implemented method of claim **1**, wherein the advertising materials are selected from the group consisting of: a banner ad, a pop-up, a text advertisement, and a rich media advertisement.

**3**. The computer-implemented method of claim **1**, wherein the repository comprises a fund.

**4**. The computer-implemented method of claim **1**, wherein the electronically collecting comprises applying the electronic revenue from the selected one or more advertising buy options, to the repository.

**5**. The computer-implemented method of claim **1**, wherein the data comprises a project type.

**6**. The computer-implemented method of claim **5**, wherein the project type is selected from the group consisting of: a non-profit project, a business project, a real estate project, and an art project.

**7**. The computer-implemented method of claim **1**, further comprising:

receiving, by the one or more processors, from the given client, in the message, a target fund amount for the content.

**8**. The computer-implemented method of claim **1**, further comprising:

prior to determining that the number of impressions is equal to the predetermined number of impressions, obtaining, by the one or more processors, via an input in the graphical user interface, a request for increasing the predetermined number of impressions of the advertising material for users visiting the at least one website; and

based on the obtaining, automatically increasing the predetermined number of impressions.

**9**. The computer-implemented method of claim **1**,

wherein the data comprises a predetermined target audience, and

wherein the at least one website comprises one or more websites frequented by the pre-determined target audience.

**10**. A computer program product comprising:

a computer readable storage medium readable by one or more processors and storing instructions for execution by the processor for performing a method comprising:

receiving, by the one or more processors, from a given client, over an Internet-based communication link from a browsing application executed on the given client processor to the one or more processors, a message comprising data, the data comprising advertising material to populate on one or more websites;

identifying, by the one or more processors, the given client, based on receiving the message, an identifier, wherein the message comprises the identifier;

based on a message provided by a given client, generating, by the one or more processors, a webpage, wherein the generating comprises providing, via a graphical

user interface of the webpage, a plurality of advertising buy options for selection by a given client accessing said webpage;

obtaining, by the one or more processors, via an input in the graphical user interface, a selection of one or more of the advertising buy options, wherein the selected one or more advertising buy options comprise at least one website of the respective websites and a predetermined number of impressions of the advertising material for users visiting the at least one website;

generating, by the one or more processors, on a database accessible to the one or more processors, a repository for advertising revenue based on the selection;

based on obtaining the selection, populating, by the one or more processors, the advertising material on the at least one website, wherein the populating comprises placing the advertising material within web property content of the at least one website;

monitoring, by the one or more processors, a number of impressions of the advertising material provided to users accessing the web property content displayed on the at least one website;

determining, by the one or more processors, whether an impression of the advertising material is valid, wherein the impression is valid based on a predetermined impression tracking system;

determining, by the one or more processors, that the number of valid impressions is greater than or equal to the predetermined number of impressions;

upon determining a number of valid impressions are met, ceasing, by the one or more processors, the populating of the advertising material on the at least one website; and

based on determining a number of valid impressions are met, electronically collecting, by the one or more processors, a share of the advertising revenue to be transmitted to the web property content owner.

**11**. The computer program product of claim **10**, wherein the advertising materials are selected from the group consisting of: a banner ad, a pop-up, a text advertisement, and a rich media advertisement.

**12**. The computer program product of claim **10**, wherein the repository comprises a fund.

**13**. The computer program product of claim **10**, wherein the electronically collecting comprises applying the electronic revenue from the selected one or more advertising buy options, to the repository.

**14**. The computer program product of claim **10**, wherein the data comprises a project type.

**15**. The computer program product of claim **14**, wherein the project type is selected from the group consisting of: a non-profit project, a business project, a real estate project, and an art project.

**16**. The computer program product of claim **10**, the method further comprising:

receiving, by the one or more processors, from the given client, in the message, a target fund amount for the content.

**17**. The computer program product of claim **10**, further comprising:

prior to determining that the number of impressions is equal to the predetermined number of impressions, obtaining, by the one or more processors, via an input in the graphical user interface, a request for increasing the predetermined number of impressions of the advertising material for users visiting the at least one website; and

US 11,416,898 B2

13

14

based on the obtaining, automatically increasing the pre-determined number of impressions.

**18**. The computer program product of claim **10**,

wherein the data comprises a predetermined target audi-ence, and

wherein the at least one website comprises one or more websites frequented by the pre-determined target audi-ence.

**19**. A system comprising:

a memory;

one or more processors in communication with the memory; and

program instructions executable by the processor via the memory to perform a method,

the method comprising:

receiving, by the one or more processors, from a given client, over an Internet-based communication link from a browsing application executed on the given client processor to the one or more processors, a message comprising data, the data comprising advertising mate-rial to populate on one or more websites;

identifying, by the one or more processors, the given client, based on receiving the message, an identifier, wherein the message comprises the identifier;

based on a message provided by a given client, generat-ing, by the one or more processors, a webpage, wherein the generating comprises providing, via a graphical user interface of the webpage, a plurality of advertising buy options for selection by a given client accessing said webpage;

obtaining, by the one or more processors, via an input in the graphical user interface, a selection of one or more of the advertising buy options, wherein the selected one or more advertising buy options comprise at least one website of the respective websites and a predetermined number of impressions of the advertising material for users visiting the at least one website;

generating, by the one or more processors, on a database accessible to the one or more processors, a repository for advertising revenue based on the selection;

based on obtaining the selection, populating, by the one or more processors, the advertising material on the at least one website, wherein the populating comprises placing the advertising material within web property content of the at least one website;

monitoring, by the one or more processors, a number of impressions of the

advertising material provided to users accessing the web property content displayed on the at least one website;

determining, by the one or more processors, whether an impression of the advertising material is valid, wherein the impression is valid based on a predetermined impression tracking system;

determining, by the one or more processors, that the number of valid impressions is greater than or equal to the predetermined number of impressions;

upon determining a number of valid impressions are met, ceasing, by the one or more processors, the populating of the advertising material on the at least one website; and

based on determining a number valid impressions are met, electronically collecting, by the one or more proces-sors, a share of the advertising revenue to be transmit-ted to the web property content owner.

**20**. The system of claim **19**, the method further compris-ing:

prior to determining that the number of impressions is equal to the predetermined number of impressions, obtaining, by the one or more processors, via an input in the graphical user interface, a request for increasing the predetermined number of impressions of the adver-tising material for users visiting the at least one web-site; and

based on the obtaining, automatically increasing the pre-determined number of impressions.

\* \* \* \* \*